**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **COREY OFFINEER,** | : | |
| | : | |
| **Plaintiff,** | : | **Case No. 09-CV-493** |
| | : | |
| **v.** | : | |
| | : | **JUDGE MARBLEY** |
| **DETECTIVE ROGER KELLY, et al.,** | : | **Magistrate Judge Kemp** |
| | : | |
| **Defendants.** | : | |

## OPINION AND ORDER

### I.  INTRODUCTION

This matter is before the Court on Defendants Detective Roger Kelly and Sheriff Matt
Lutz's Motion for Summary Judgment for Qualified Immunity (Doc. 32) and Plaintiff Corey
Offineer's Cross Motion for Partial Summary Judgment Against Defendant Kelly – Fifth
Amendment Violations (Doc. 45).  For the reasons discussed below, Defendants' Motion is
**GRANTED** in part and **DENIED** in part, and Plaintiff's Cross Motion is **DENIED**.

### II. BACKGROUND

### A. SEXUAL ASSAULT REPORTED

On May 30, 2006, Christine Robbins and Michael Offineer took their eleven-month-old
daughter to Southeastern Ohio Regional Medical Center to be examined for possible sexual
assault.  The parents spoke with Michelle Dayton, M.D., about the baby's recent behavioral
changes, including grabbing her genitals and belly button, hitting herself, crying when her diaper
was changed, waking up screaming at night, and red and irritated genitals.  They stated that this
behavior had begun approximately two weeks prior to their taking her to the doctor.  They stated

that they suspected that Corey Offineer, Michael Offineer's brother, had done something to the baby, because her behavioral changes began after he returned to Ohio from California.

Dr. Dayton performed an examination of the baby, during which the baby screamed and cried. Dr. Dayton discovered a two millimeter laceration at the posterior fourchette, hyperemic perivaginal area. She then called the Muskingum County Sheriff's Office to report that she had observed evidence of injury to the genital area of the baby, and that the injury was consistent with penetration to the vaginal area. Dr. Dayton also informed the Sheriff's Office that the baby's parents reported that the baby's behavioral changes had begun when Corey Offineer came into her life.

Muskingum County Sheriff's Deputy Gearhart went to the hospital to begin the investigation. The hospital nurse informed him that the examination revealed bruising to the baby's hymen and a tear to the posterior fourchette. The nurse told him that this is a common area for sexual assault injury. Gearhart also spoke with Christine Robbins, the baby's mother. Robbins related the same behavioral changes that she had described to Dr. Dayton. She also informed Gearhart that the only people who had custody of the baby were herself, the baby's father, and All for Kids Daycare.

Gearhart then spoke with Michael Offineer, the baby's father. Michael Offineer explained that his brother, Corey Offineer had recently come back to Ohio from California, and that he had been acting strange since his return, including exhibiting paranoid behavior. He explained that on Saturday, May 27, 2006, he noticed redness in the baby's diaper when he changed it. He also stated that he had left the baby with Corey Offineer that evening for about an hour, and that the baby was crying in her crib. The next morning, the baby woke up crying

2

around 5:30 am.  Michael thought that Corey had been in the baby's room, but he was not sure.

Michael stated that Corey did a lot of drugs, was bi-polar, and saw a psychiatrist sometimes.

Detective Kelly was subsequently assigned to investigate the allegations of sexual assault.

On May 29, 2006, Corey Offineer was arrested by the Zanesville Police Department.  He

was found standing in the street in Zanesville with his shirt off, holding a shotgun.  He told

police officers that he felt threatened because a vehicle containing African-Americans had

followed him from Columbus to Zanesville, and he thought someone was coming after him.  He

was arrested for inducing panic and taken to the Zanesville City Jail.

### B. DETECTIVE KELLY'S INVESTIGATION

Offineer remained in jail while Detective Kelly began his investigation.  On June 5,

2006, Kelly interviewed Offineer at the jail.  No recording was made of the interview.  At a later

suppression hearing, Sergeant Ric Roush testified that Offineer was brought down for the

interview by corrections officers carrying him in a hog-tied position, and that Offineer was

resisting them.  Roush testified that Offineer was "acting very bizarre" and "making various

statements in regards to things that I think he was seeing or hearing, people chasing him, to that

effect."  Kelly read Offineer his rights, and Offineer asked no questions about his rights.  Roush

testified that, during the interview, Offineer "responded but in a – in a bizarre nature, I guess,

just changing course in his answers from one question to the next."

At the same suppression hearing, Kelly testified about the June 5 interview.  He stated

that when he asked Offineer if he knew why Kelly was there, Offineer said "it was because

people were chasing him."  Kelly testified that, when he told him he was there to talk about the

baby, Offineer first said, "I didn't hurt that girl," but that he then became quiet and said, "I did

it." When Kelly asked him what he did, he said he raped her. Offineer told Kelly that he used "his finger, his penis, a pipe." Offineer initially told Kelly that he raped the baby at daycare. After Kelly explained that it could not have happened at the daycare, Offineer "was back and forth both ways." At that point, Kelly suspected Offineer "was on drugs or had a mental problem," and he terminated the interview.

Kelly conducted a second interview with Offineer on June 6, 2006, one day after the first interview. That interview was recorded. Kelly began by asking Offineer if he remembered what they had talked about the day before. Offineer stated that they had talked about her niece and what he did to her. When Kelly asked him about that, Offineer stated, "[w]hich was I . . . pretty much raped her of her life. I . . . I, uh . . . raped her. Uh . . . I just (loud noise) (inaudible). I was . . . the wrong (inaudible) and there's no way goin' back and she's gone now." Kelly asked him when it happened, and Offineer responded, "last night." When Kelly asked what Offineer did last night, he replied, "I killed her." Kelly asked him how he did that while he was in jail, and Offineer stated, "she was upstairs." Kelly then informed Offineer that the baby was not in jail the night before, and Offineer stated, "Well I was at the house and I was downstairs in the living room and I was playin' with her and uh . . . I just started (inaudible) on her and uh . . . I kept messin' with her and . . . (inaudible). Everything and uh . . . I (inaudible) killed her." Kelly asked him which house he was talking about, and Offineer told him it was his parents' house and gave the address. Kelly asked Offineer what happened, and the following exchange occurred:

Q: Okay. What was the first thing you did?

A: I was playin' with her, I just . . . relaxin' and I laid her down and started messin' with her, you know, uh . . . just feelin' her up.

Q: Well whadda you mean by that?

4

A: Whadda I mean by that is I was rapin' her.

Q: Well what does that mean?

A: It means I was goin' into . . . intercourse.

Q: And what were you doin' intercourse with?

A: With [Baby M.][1]

Q: I know, but what party of the body were you using?

A: Vagina.

Q: And what part of your body?

A: My hand.

Offineer then described how he took the baby's clothes off and began touching her vagina with his fingers, "rubbin' up and down."  He stated that he repeatedly put his finger into her vagina, and that he put his index finger "[a]ll the way" in.  He said that he then put her penis in her vagina, "in and out.  Back and forth."  He said it went five or six inches inside of her.  He also stated that he ejaculated inside of her.  Kelly mentioned that Offineer had talked about using a pipe in their first interview, and Offineer stated that he put a metal pipe "in her anal and vagina."  He said he found the pipe in the garage, and he put in back in the garage when he was finished.  He said he "put a metal rod . . . hot metal rod in her pussy," and that he "burned her womb."

Kelly again asked Offineer when this happened.  Offineer initially said, "last night," but Kelly told him he was not watching her the night before because he was in jail.  Offineer then said it happened before he went to jail, on Wednesday.  Kelly asked if he was sure or if it could

---

[1]The baby's name is redacted to protect her privacy.

5

have been another day, and Offineer stated that it happened on Monday.  He said he was watching the baby for three or four hours.  Kelly asked him what happened after he was finished, and he stated that he killed his "family off one by one."  Kelly asked him whether he had done what he did to the baby to anyone else outside of his family, and he said he had, to a "rock singer," who was "about forty," and that he did it "up in jail."  Kelly asked whether there was anything else he wanted to say.  Offineer said there was nothing else, and the interview ended.

The same day, Kelly met with Prosecutor Michael Haddox, and gave him his entire investigation file to review.  He told Haddox that Offineer had admitted to raping the girl, and that Offineer acted strangely during the interviews, as though he was on drugs or had a mental problem.  He gave Haddox the medical records and all of the information Deputy Gearart had collected during his initial investigation.  He informed Haddox that Offineer had initially denied huring the baby, then admitted to raping her, killing her, killing his family, and doing something to a rock singer in jail.

After meeting with Kelly, the Prosecutor decided to press charges against Offineer.  A complaint was prepared by the Prosecutor's office.  Kelly picked up the complaint from the Prosecutor's office and took it to court and signed it.

On June 7, 2006, Kelly met with Offineer's parents.  They informed him that he is bi-polar, that he takes medication for it, and that they did not think he had been taking his medication, because it had not be refilled in a while.  The parents told Kelly that Offineer had been acting strangely since he returned from California, and that he had told them that he thought people were after him and his family, and that they were not safe.  The also stated that Offineer had watched the baby on May 20, 2006.

On June 9, 2006, Kelly met with Lisa Roederer from All for Kids Day Care, where the baby had been attending.  He interviewed her and obtained records from the day care center. That same day, he met again with Christine Robbins, the baby's mother.  She repeated the behavioral changes she had previously described, and stated that the changes began the week of May 22, 2006.

After completing his investigation, Kelly again met with Haddox.  Haddox decided to present the case to a grand jury.  The grand jury issued an indictment August 10, 2006.

### C. TRIAL

After the grand jury indicted Offineer on a charge of sexual assault of a minor, a bench trial was conducted.  Offineer moved to suppress his two confessions, contending that he did not knowingly, intelligently, and voluntarily waive his *Miranda* rights.  The trial judge held a suppression hearing, at which Detective Kelly, Sergeant Roush, and Detective Steve Welker testified regarding the two interviews conducted at the jail.

At the suppression hearing, Detective Kelly was asked about his impression of Offineer's mental state during the interviews:

> Q:     And at some point in time, then, did you decide that perhaps this was a young man that was – that was mentally disturbed?
>
> A:     Well, I mean, I don't know if he was mentally disturbed or not; but I think that he was definitely telling me things that I knew for a fact that was not true.

The court then questioned Detective Kelly about the reliability of Offineer's statements:

> Q:     On this first deal with the June the 5th statement, both you and Detective Sergeant Roush indicate that you believe at the time that he was – either had mental problems or on drugs at the time you were taking the statement?
>
> A:     Yes, sir.

7

> Q:     Would you call that statement reliable?
>
> A:     Not everything, no.
>
> Q:     Any of it?
>
> A:     Well, I believe something happened.
>
> Q:     But can you glean if you feel about that statement that you would rely upon that statement?
>
> A:     Just that statement alone?
>
> Q:     Yes.
>
> A:     No, sir.

Detective Welker was asked about his impression of Offineer's mental state during the June 6 interview:

> Q:     Now at some point in time during this interview, did you become suspect of – of Corey's ability to recount the facts intelligently and accurately?
>
> A:     I thought that either Corey was messing with us in the interview or he was mentally ill.
>
> Q:     Now, would you – would you say that – that this was a reliable statement that he made to you and Detective Kelly?
>
> A:     No.
>
> Q:     Okay.  You wouldn't be willing to rely on it, would you?
>
> A:     No.

Based upon the officers' testimony regarding the two interviews, the trial court suppressed Offineer's statements made during both interviews, finding that he did not knowingly, intelligently, and voluntarily waive his *Miranda* rights.

8

The trial court then conducted a bench trial, at which the confessions were not introduced into evidence.  Without the confessions, the trial court was not convinced beyond a reasonable doubt that Offineer had sexually assaulted the baby, and he was acquitted.

### D. THIS LAWSUIT

Offineer filed his initial Complaint in this case on June 16, 2009.  On July 13, 2009, Offineer filed his First Amended Complaint.  Offiner named the following parties as defendants in the action: Detective Roger Kelly; Muskingum County Sheriff Matt Lutz; Six County, Inc.; Darcy Stephens; Amy Brand, R.N.; Danine Lajiness-Polosky; Bonnie J. Taylor; and William Clark Harlan, D.O.  The Complaint alleged eight separate claims, only five of which are relevant to the instant Motions.  Against Detective Kelly and Sheriff Lutz, Offineer alleges the following: (1) a Fourth Amendment violation for wrongful prosecution; (2) a Fifth Amendment violation for the use of involuntary self-incriminating statements in a criminal case; (3) a Fourteenth Amendment violation for fabricating knowingly unreliable evidence in violation of Offineer's due process rights; (4) a state law claim for malicious prosecution; and (5) municipal liability on behalf of the Sheriff's Department as a result of a policy causing constitutional violations. Defendants contend that they are entitled to qualified immunity on all of these claims.  Plaintiff counters that he is entitled to summary judgment on his Fifth Amendment claim, and that Defendants are not entitled to qualified immunity on any claims.

### III. STANDARD OF REVIEW

Summary judgment is proper if "there is no genuine issue as to any material fact [such that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(C).  But "summary judgment will not lie if the . . . evidence is such that a reasonable jury could return a

9

verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, a court must construe the evidence in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The movant therefore has the burden of establishing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388-89 (6th Cir. 1993). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. But the non-moving party "may not rest merely on allegations or denials in its own pleading." Fed. R. Civ. P. 56(e)(2); *see Celotex*, 477 U.S. at 324; *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994). The non-moving party must present "significant probative evidence" to show that there is more than "some metaphysical doubt as to the material facts." *Moore v. Philip Morris Co.*, 8 F.3d 335, 339-40 (6th Cir. 1993). When ruling on a motion for summary judgment, a district court is not required to sift through the entire record to drum up facts that might support the nonmoving party's claim. *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989). Instead, the Court may rely on the evidence called to its attention by the parties. *Id.*

## IV. LAW & ANALYSIS

Plaintiff alleges five separate causes of action against these Defendants under Section 1983: (1) a Fourth Amendment claim; (2) a Fifth Amendment claim; (3) a Fourteenth Amendment claim; (4) a state law malicious prosecution claim; and (5) a municipal liability claim. The Court will address each in turn.

10

## A. FOURTH AMENDMENT CLAIM

Plaintiff contends that Detective Kelly is liable for malicious prosecution in violation of the Fourth Amendment.  Plaintiff bases this claim on his allegations that Detective Kelly knew Offineer's confessions were unreliable, that Kelly coached Offineer's confessions, and that Kelly failed to disclose all of the relevant facts to Prosecutor Haddox.  Defendants counter that Detective Kelly cannot be liable for malicious prosecution because he supplied a full and fair disclosure of all material facts to Prosecutor Haddox.

The Sixth Circuit "recognize[s] a separate constitutionally cognizable claim of malicious prosecution under the Fourth Amendment." *Thacker v. City of Columbus*, 328 F.3d 244, 259 (6th Cir. 2003).  In order to successfully assert such a claim, "a plaintiff must show, at a minimum, 'that there was no probable cause to justify [his] arrest and prosecution.'" *Id.* (quoting *Darrah v. City of Oak Park*, 255 F.3d 301, 312 (6th Cir. 2001)).  Offineer alleges that it was error for Detective Kelly to withhold the tape and transcript of his second confession from Prosecutor Haddox.[2]

Where a police officer gives "the prosecutor a full and fair disclosure of all the material facts as revealed by [his] investigation, including [the accused's] exculpatory statements," he "will not be held liable for the instigation of criminal proceedings." *Radvansky v. City of Olmstead Falls*, 395 F.3d 291, 316-17 (6th Cir. 2005).  In general, "a police officer may not be held liable for malicious prosecution when he did not make the decision to prosecute." *McKinley v. City of Mansfield*, 404 F.3d 418, 444 (6th Cir. 2005).  This holds true "as long as the information he submitted to the prosecutor is truthful." *Kinkus v. Village of Yorkville*, 289 F.

---

[2]No tape recording or transcript of Offineer's first confession was made.

11

App'x 86, 91 (citing *Skousen v. Brighton High Sch.*, 305 F.3d 520, 529 (6th Cir. 2002)).  In the end, a police officer's liability for malicious prosecution "turns on what information [the] prosecutor . . . had prior to deciding upon a charge." *Radvansky*, 395 F.3d at 317.

There is no doubt in this case that Prosecutor Haddox made the decision to charge Offineer.  Haddox stated in both his affidavit and his deposition testimony that the decision to charge Offineer was made by his office, and not by Detective Kelly.  (Haddox Aff. ¶¶ 6-7; Haddox Dep. at 12.)  Offineer has produced no evidence that Detective Kelly was actually the decision-maker when it came time to charge Offineer.  As a result, Detective Kelly is only liable for malicious prosecution if he failed to give truthful information to the prosecutor.

Defendants contend that Detective Kelly is entitled to qualified immunity on Offineer's Fourth Amendment claim.  "[Q]ualified immunity precludes actions for damages against government officials on the basis of discretionary actions that do not 'violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harris v. Bornhorst*, 513 F.3d 503, 511 (6th Cir. 2008) (quoting *Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999) (en banc)).  An arresting officer "is entitled to qualified immunity if he or she could reasonably (even if erroneously) have believed that the arrest was lawful, in light of clearly established law and the information possessed at the time by the arresting agent." *Id.* (citing *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)).  The right to be free from malicious prosecution under the Fourth Amendment has been clearly established since at least 1999.  *See Spurlock v. Satterfield*, 167 F.3d 995, 1005-06 (6th Cir. 1999) ("Satterfield cannot seriously contend that a reasonable police officer would not know that such actions were inappropriate and performed in violation of an individual's constitutional and/or statutory rights." (citing cases involving *Brady*

12

duties, the use of false testimony to obtain conviction, and detention without probable cause)). Detective Kelly is therefore not entitled to qualified immunity on Offineer's Fourth Amendment claim.

Offineer contends that Detective Kelly failed to give Prosecutor Haddox a complete picture of the circumstances surrounding Offineer's confessions, namely that he gave inconsistent answers to questions regarding details of the alleged sexual assault and he told Detective Kelly things that were clearly not true.  Offineer also accuses Detective Kelly of failing to preserve exculpatory evidence by declining to collect and test evidence from the house where the alleged sexual assault took place, declining to request a rape kid, and declining to make a recording of the first confession.  Finally, Offineer alleges that Detective Kelly asked Offineer leading questions throughout both of his confessions, and failed to give Haddox the proper context for Offineer's answers to those qusetions.  Defendants counter that Detective Kelly gave Prosecutor Haddox his entire investigation file and a summary of all of his findings, including informing Haddox of Kelly's concerns about Offineer's mental state.

The Parties disagree as to exactly what documents and information Kelly gave to Haddox.  It is unclear from the record whether Haddox was ever given a transcript or recording of Offineer's second confession.  Haddox's affidavit and deposition testimony conflict regarding whether Detective Kelly gave him certain exhibits.[3]  Detective Kelly contends that he gave

---

[3]The exhibits at issue are Detective Kelly's supplemental reports.  In his affidavit, Haddox states that Kelly "shared the contents" of the reports with him.  (Haddox Aff. ¶4.)  In his deposition, Haddox testified that he did not actually see any of the reports.  (Haddox Dep. at 26-27.)

Haddox his entire investigation file, but Haddox's deposition testimony intimates that Kelly simply summarized his findings, rather than giving him the file.

The Sixth Circuit has held that tape recordings of confessions made in response to leading questions are relevant and potentially exculpatory evidence that should be considered when making probable cause determinations. *See Sutkiewicz v. Monroe County Sheriff*, 110 F.3d 352, 358 (6th Cir. 1997). In *Sutkiewicz*, the Sixth Circuit reversed the trial court's denial of a motion for a new trial. The motion was based on the fact that audio tapes of the suspect's confession, which revealed that the investigator "at the very least led [the suspect] to 'confess' certain facts about the murder, and more likely fed [the suspect] those facts." *Sutkiewicz*, 110 F.3d at 358-59. Because "the strongest evidence liking [the suspect] to the murder [was] his confessions . . . and it [was] those confessions that provide[d] the requisite probable cause," the court found the tapes relevant and concluded that they should have been turned over to the prosecutor to make a probable cause determination. *Id*. at 359.

Here, Offineer alleges that Haddox should have been given the transcript of his second interview. Detective Kelly concedes that he did not give Haddox the transcript, as their meeting occurred immediately following the interview, and the transcript had not yet been prepared. While Detective Kelly provided Haddox with a summary of what happened at both the first and second interviews, he withheld from Haddox the context for Offineer's confessions. He did not inform Haddox, for example, that much of Offineer's confessions were based upon facts Detective Kelly gave him, rather than facts Offineer offered himself. Haddox testified in his deposition that he did not remember Detective Kelly telling him that Offineer seemed confused about whether he raped or killed the baby. He also testified that he did not remember Detective

Kelly telling him that Offineer originally told Kelly that the sexual assault happened somewhere else, and that Offineer only said it happened at the house after Kelly told him his original answer was wrong.  He similarly did not remember being told that physical force had to be used to bring Offineer to his initial interview.

Viewing the facts in the light most favorable to Offineer, as the Court must do when evaluating Defendants' Motion for Summary Judgment, the Court is faced with a police officer who interrogated a suspect once without recording anything, stopped the interrogation because of concerns about the suspect's mental state, and then interrogated the same suspect the next day. When providing the prosecutor with evidence, the police officer gave the prosecutor a summary of the substance of the suspect's confessions without giving him a full picture of the context for the confessions.  He left out details regarding the leading questions he asked, as well as the suspect's confusion regarding what happened and where it happened, and the fact that the suspect was only able to piece together the "appropriate" story after Detective Kelly corrected him several times.  With the confessions being the strongest evidence tying Offineer to the crime, the Court has to agree with the *Sutkiewicz* Court that the transcript of the second interrogation[4] was relevant and potentially exculpatory evidence that should have been given to the prosecutor before the decision to charge was made.  Whether the exclusion of that transcript and the details regarding Detective Kelly's leading questions precludes a determination that Kelly gave Haddox a "full and fair disclosure of all the material facts" is a factual question inappropriate for resolution on summary judgment.

---

[4]The Court is also troubled by the fact that no type of recording was made of the first interrogation, making it impossible for the prosecutor to understand the context of any statements Offineer made during that exchange.

15

Because the resolution of Offineer's Fourth Amendment claim for malicious prosecution turns on what information Detective Kelly gave Haddox and whether that constituted a full and fair disclosure of all the material facts, and a genuine issue of material fact remains regarding what information Detective Kelly actually shared with Prosecutor Haddox, Defendant's Motion for Summary Judgment on that claim is **DENIED**.

### B. FIFTH AMENDMENT CLAIM

Both parties contend that they are entitled to summary judgment on Offineer's Fifth Amendment claim.  As an initial matter, Defendants contend that Detective Kelly is entitled to absolute immunity for his testimony before the grand jury because this is a Section 1983 action. In addition, Defendants assert that, because Offineer's self-incriminating statements were not used against him at a criminal trial, there can be no constitutional violation, and they are entitled to judgment as a matter of law.  Even if there was a constitutional violation, Defendants contend, Detective Kelly is entitled to qualified immunity because the constitutional right at issue was not clearly established at the time of the alleged violation.  Plaintiff counters that he is entitled to summary judgment because involuntary self-incriminating statements were used against him in a criminal case,[5] and that qualified immunity is not warranted because the right has been clearly established since 2005.

The Fifth Amendment reads, in pertinent part, "No person . . . shall be compelled in any criminal case to be a witness against himself."  US Const. Amend. V.  The parties here disagree

---

[5] Plaintiff contends that the entire case against him was predicated on the two involuntary self-incriminating statements, and that even though the statements were not used against him at trial, his Fifth Amendment rights were violated by the institution of a criminal case against him based on the statements and Detective Kelly's testimony regarding the statements in front of the grand jury.

regarding the proper interpretation of "criminal case" as used in the Fifth Amendment.

Defendants contend that the right can only be violated if statements are used at a criminal trial.

Plaintiff contends that the right is violated when statements are used at any point during a

criminal case, including the decision to press charges and testimony given beforr a grand jury.

As a threshold matter, the Court notes that police officers are afforded absolute immunity

from liability in Section 1983 suits for testimony given in judicial proceedings. *Briscoe v.*

*LaHue*, 460 U.S. 325, 345 (1983). This immunity applies not only to testimony at a criminal

trial, but also to testimony before a grand jury. *Oatman v. Potter*, 92 F. App'x 133, 141 (6th Cir.

2004) ("[T]here can be no viable Fifth Amendment violation inasmuch as Inspector Winter's

testimony is covered under absolute immunity since his statements stemmed from his grand jury

testimony." (citing *Macko v. Byron*, 760 F.2d 95, 97 (6th Cir. 1995))). As a result, Detective

Kelly's testimony at the jury regarding Offineer's confessions cannot be the basis of any

potential Section 1983 liability for a violation of Offineer's Fifth Amendment rights. The only

basis left on which liability could lie, then, is the fact that Detective Kelly used Offineer's

statements in relaying the results of his investigation to Prosecutor Haddox. The Court must

therefore decide whether that use of Offineer's confessions violated his Fifth Amendment rights.

The Parties have differing views on the controlling precedent and the definition of the

"criminal case" language in the Fifth Amendment. Defendants rely primarily on the United

States Supreme Court decision in *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990), and

an opinion out of this Court, *Grooms v. Marshall*, 142 F.Supp.2d 927 (S.D. Ohio 2001),

interpreting *Verdugo-Urquidez*. Plaintiffs, on the other hand, rely on the Supreme Court's

decision in *Chavez v. Martinez*, 538 U.S. 760 (1994), and the Sixth Circuit's opinion in

17

*McKinley v. City of Mansfield*, 404 F.3d 418 (6th Cir. 2004), interpreting *Chavez*. The Court

will address both lines of cases.

In *Verdugo-Urquidez*, the Supreme Court noted in dicta that a Fifth Amendment violation

occurs only where involuntary self-incriminating statements are introduced against a defendant

at a criminal trial. *Verdugo-Urquidez*, 494 U.S. at 264 ("The privilege against self-incrimination

guaranteed by the Fifth Amendment is a fundamental trial right of criminal defendants.

Although conduct by law enforcement officials prior to trial may ultimately impair that right, a

constitutional violation occurs only at trial."). In *Grooms*, this Court relied on that language to

hold that where a defendant's involuntary self-incriminating statements were used against him

during grand jury proceedings but not at trial, there was no Fifth Amendment violation. *Grooms*,

142 F.Supp.2d at 937 ("In the present case, while it appears that Plaintiffs' allegedly compelled

self-incriminating statements were used against them in the grand jury proceeding, they were

never introduced against Plaintiffs at trial. Indeed . . . neither Plaintiff was ever prosecuted for

the offense for which he was indicted. Thus, in light of the Supreme Court's unequivocal

pronouncement in *Verdugo-Urquidez*, Plaintiffs' Fifth Amendment rights, as a matter of law,

were not violated.").

Subsequent to both *Verdugo-Urquidez* and *Grooms*, the Supreme Court decided *Chavez*.

There, the Court was again faced with the question of how to interpret the "criminal case"

language of the Fifth Amendment. In *Chavez*, a defendant's *Miranda* rights were violated, but

criminal charges were never filed against him. *Chavez*, 538 U.S. 764. The Court held that,

because "his statements were never admitted as testimony against him in a criminal case," and he

was never "placed under oath and exposed to the cruel trilemma of self-accusation, perjury or

18

contempt," his Fifth Amendment rights were not violated.  *Id*. at 767 (internal quotation marks omitted).  The Court explicitly reserved the question of when a "criminal case" begins, deciding only that police questioning, without more, does not constitute a "criminal case."  *Id*. at 766-67 ("We need not decide today the precise moment when a 'criminal case' commences; it is enough to say that police questioning does not constitute a 'case' any more than a private investigator's precomplaint activities constitute a 'civil case.'  Statements compelled by police interrogations of course may not be used against a defendant at trial, but it is not until their use in a criminal case that a violation of the Self-Incrimination Clause occurs.").  The Sixth Circuit, relying on *Chavez* subsequently held that, "[i]t is only once compelled incriminating statements are used in a criminal proceeding . . . that an accused has suffered the requisite constitutional injury for purposes of a § 1983 action."  *McKinley*, 404 F.3d at 430.  The Sixth Circuit noted that "[t]he *Chavez* decision may leave room for a challenge to the use of coerced statements in a grand jury proceeding, however the thrust of the opinion rests on the view that the Fifth Amendment is a trial protection."  *Id*. at 430 n.11 (internal citation omitted).  Because McKinley's allegedly compelled self-incriminating statements were actually introduced against him at trial, the issue of when a "criminal case" begins was not squarely at issue in *McKinley*.  *Id*. at 431 ("[I]t cannot be disputed that McKinley's statements from the second interview were used as evidence against him at trial.").

        The Court finds that none of the cases relied upon by the parties directly controls the outcome in this case.  The *Verdugo-Urquidez* opinion dealt substantively with the Fourth Amendment, and discussed the Fifth Amendment in dicta.  *See Verdugo-Urquidez*, 494 U.S. at 264 ("Before analyzing the scope of the Fourth Amendment, we think it significant to note that it

operates in a different manner than the Fifth Amendment, which is not at issue in this case."). In *Grooms*, and *Chavez*, the defendants who made involuntary self-incriminating statements were never prosecuted.  In *McKinley*, the involuntary self-incriminating statements were actually used against the defendant at a criminal trial.  Here, the defendant was prosecuted based almost entirely on his involuntary self-incriminating statements,[6] but his statements were suppressed at a bench trial.

While the Court is unaware of, and the parties have provided no citation to, any authority directly on point, the Supreme Court has indicated that this type of use of self-incriminating statements does not violate the Fifth Amendment.  *See United States v. Williams*, 504 U.S. 36, 49 (1992) ("[A]lthough the grand jury may not force a witness to answer questions in violation of [the Fifth Amendment's] constitutional guarantee against self-incrimination, our cases suggest that an indictment obtained through the use of evidence previously obtained in violation of the privilege against self-incrimination is nevertheless valid." (internal quotation marks and citation omitted)).

In the absence of any authority holding that this use of self-incriminating statements violates the Fifth Amendment, Defendants are entitled to summary judgment on Offineer's Fifth Amendment claim.  Defendants' Motion on that claim is therefore **GRANTED**, and Plaintiff's Cross Motion is **DENIED**.

---

[6] Indeed, without the admission of the self-incriminating statements, there was insufficient evidence to convict Offineer of the charges against him.

## C. FOURTEENTH AMENDMENT CLAIM

Offineer alleges that Detective Kelly violated his Due Process rights under the Fourteenth Amendment.  Specifically, Offineer accuses Kelly of failing to turn over all exculpatory evidence to the prosecutor at the end of his investigation.  Defendants acknowledge the existence of such a right, but contend that Detective Kelly met his obligation to turn over all exculpatory evidence.

In 1963, the Supreme Court announced that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963).   The Sixth Circuit has held that "the due process guarantees recognized in *Brady* also impose an analogous or derivative obligation on the police." *Modowan v. City of Warren*, 578 F.3d 351, 381 (6th Cir. 2009).  The Court first notes that Detective Kelly is not entitled to qualified immunity on this claim.  The Sixth Circuit has held that a police officer's obligation to turn over all exculpatory evidence has been clearly established since 1990.  *See id*. at 381-82 ("Decisions from other circuits recognizing the type of '*Brady*-derived claims that [the plaintiff] asserts here date back as far as 1964.  In fact, at least three circuits recognized prior to August 1990 . . . that this right was clearly established.  Although our recognition of this type of a claim is more recent and less specific, the overwhelming number of decisions from other circuits recognizing this type of claim satisfies us that any reasonable police officer would know that suppressing exculpatory evidence was a violation of the accused's constitutional rights.").  Because the right was clearly established as

21

early as 1990, it was clearly established at the time of Detective Kelly's actions in this case, and he is therefore not entitled to qualified immunity.

The issue for the Court to resolve, then, is whether Detective Kelly fulfilled his obligation to turn over all exculpatory evidence.  Offineer contends that Detective Kelly failed to give Prosecutor Haddox a complete picture of the circumstances surrounding Offineer's confessions, namely that he gave inconsistent answers to questions regarding details of the alleged sexual assault and he told Detective Kelly things that were not true.  Offineer also accuses Detective Kelly of failing to preserve exculpatory evidence by declining to collect and test evidence from the house where the alleged sexual assault took place, declining to request a rape kid, and declining to make a recording of the first confession.  Finally, Offineer alleges that Detective Kelly asked Offineer leading questions throughout both of his confessions, and failed to give Haddox the proper context for Offineer's answers to those qusetions.  Defendants counter that Detective Kelly gave Prosecutor Haddox his entire investigation file and a summary of all of his findings, including informing Haddox of Kelly's concerns regarding Offineer's mental state.

As discussed within the Fourth Amendment claim analysis, a genuine issue of material fact remains regarding whether Detective Kelly gave Haddox a full and fair disclosure of all the material facts.  Viewing the facts in the light most favorable to Offineer, as the Court must do when evaluating Defendants' Motion for Summary Judgment, a genuine issue of material fact exists about what information Detective Kelly actually shared with Prosecutor Haddox.  *See Radvansky*, 395 F.3d at 317 (noting that "liability for malicious prosecution turns on what

information [the] prosecutor . . . had prior to deciding upon a charge for burglary.").[7]  Because a genuine issue of material fact remains on Plaintiff's Fourteenth Amendment claim, Defendants' Motion with respect to that claim is **DENIED**.

### D. STATE LAW MALICIOUS PROSECUTION CLAIM

Under Ohio law, '[t]o prevail on a malicious prosecution claim in a criminal setting, a plaintiff must prove '(1) malice in instituting or continuing the prosecution, (2) lack of probable cause, and (3) termination of the prosecution in favor of the [criminal] defendant.'" *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 316 (6th Cir. 2005) (quoting *Trussell v. Gen. Motors Corp.*, 559 N.E.2d 732, 735 (Ohio 1990)).  Where police officers "provide the prosecutor with 'a full and fair disclosure of all the material facts as revealed by [their] investigation, including [the accused's] exculpatory statements,'" they will not be liable for instituting criminal prosecution. *Id*. at 316-17 (quoting *Robbins v. Fry*, 594 N.E.2d 700, 701 (Ohio App. 1991)).  Where, however, a police officer "provides false information or . . . demonstrates a desire, direction, request or pressure for the initiation of criminal proceedings," he may be liable for malicious prosecution.  *Id*. at 317.

Ohio law generally shields employees of political subdivisions from liability civil actions brought to recover damages cause by acts or omissions connected to government functions. O.R.C. § 2744.03(A).  That immunity exists unless: "(a) [t]he employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities; (b) [t]he

---

[7]While the *Radvansky* decision dealt with a malicious prosecution claim, the logic applied there is equally applicable to this case: if liability for malicious prosecution turns on the information the prosecutor had when making the decision to charge, it follows that a determination regarding whether the government's *Brady* obligations were met should also consider the information the prosecutor had.

employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner; [or] (c) [c]ivil liability is expressly imposed upon the employee by a section of the Revised Code."  O.R.C. § 2744.03(A)(6).  Here, Offineer appears to be alleging that Detective Kelly acted with malicious purpose, in bad faith, or in a wanton or reckless manner.

Malice exists where there is "willful and intentional design to do injury, or the intention or desire to harm another, usually seriously, through conduct which is unlawful or unjustified." *Cook v. Hubbard Exempted Village Bd. of Educ.*, 688 N.E.2d 1058, 1061 (Ohio App. 1996) (internal quotation marks omitted).  Similarly, bad faith "imports a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud."  *Id.* (internal quotation marks omitted).  And "an individual acts in a reckless manner if he does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent."  *Id.* at 1062 (internal quotation marks omitted).

The only indication in the record that Detective Kelly acted with malicious purpose, in bad faith, or in a wanton or reckless manner is the fact that he used Offineer's involuntary self-incriminating statements in his discussions with Prosecutor Haddox.[8]  The Ohio Supreme Court has held that:

---

[8]He also testified regarding those statements at the grand jury.  As discussed above, however, he is afforded absolute immunity from liability under Section 1983 for testimony in judicial proceedings.  *See, e.g.*, *Briscoe*, 460 U.S. at 345.

24

> [I]nadmissible evidence can and often should be evaluated in deciding whether to prosecute.  Examples include the results of a faulty search and seizure, hearsay, *technically flawed confessions*, and witness statements.  Though not admissible in the criminal trial, such evidence may have relevance in showing whether the decision to prosecute was undertaken maliciously.

*Criss v. Springfield Twp.*, 564 N.E.2d 440, 443 (Ohio 1990) (emphasis added).  Given that "technically flawed confessions" can permissibly be considered when determining whether to prosecute, the use of such confessions cannot be deemed malicious or reckless.  As a result, Detective Kelly is entitled to statutory immunity against Offineer's state malicious prosecution claim, and his Motion for Summary Judgment on that claim is **GRANTED**.

### E. MUNICIPAL LIABILITY CLAIM

Offineer contends that Sheriff Matt Lutz is liable, in his official capacity, for all of the constitutional violations he alleges were committed by Detective Kelly.  Defendants counter that Offineer has established neither a constitutional violation, nor the existence of a custom or policy as the driving force behind that violation.  Offineer argues that this motion comes too early in the proceedings, as it does not deal with a claim for which qualified immunity is available.

The Court has already determined that genuine issues of material fact exist regarding two of Offineer's constitutional claims, and as a result, Defendants' assertion that Offineer has not established a constitutional violation cannot be the basis for granting summary judgment on the municipal liability claim.  In addition, cities are unable to assert qualified immunity as a shield to liability in Section 1983 cases.  *Owen v. City of Independence*, 445 U.S. 622, 638 (1980).  At this point in the litigation, then, it would be inappropriate for the Court to resolve the municipal liability claim on summary judgment, as Defendants' Motion was couched as one based upon a

qualified immunity defense.  As a result, Defendants' Motion on the municipal liability claim is

**DENIED**.

## V. CONCLUSION

For the reasons set forth in this Opinion, Defendants' Motion for Summary Judgment is

**GRANTED** in part and **DENIED** in part.  The Motion is **GRANTED** with respect to Plaintiff's

Fifth Amendment and State Law Malicious Prosecution claims, and the Motion is **DENIED** with

respect to Plaintiff's Fourth Amendment, Fourteenth Amendment, and Municipal Liability

claims.  Plaintiff's Cross Motion for Summary Judgment is **DENIED**.

**IT IS SO ORDERED.**


**/s Algenon L. Marbley**
**Algenon L. Marbley**
**United States District Judge**


**Dated: September 24, 2010**